# Rays *vs* Woods, and Daniel, &c. *vs* Allison.

### APPEAL FROM THE GENERAL COURT.

*Surveys on entries West of the Tennessee River.*

JUDGE EWING delivered the opinion of the Court.

THESE two cases may be considered together, as they involve the same legal questions; they are separate actions of ejectment brought by the appellees against the appellants in the Court below, in which the former claim title under patents which issued on surveys made by virtue of entries for military services made prior to 1792, on the south-west side of the Tennessee river. The latter claim title and possession under junior patents which issued under the laws of Kentucky, and contend that the patents of the former are varient from their entries,

Vol. II.     28

*Margin notes:*

RAYS
*vs*
WOODS, AND
DANIEL, &c.
*vs*
ALLISON.

EJECTMENT.

*Case* 70.

*December* 27.

The controversy stated.

RAYS
vs
WOODS, AND
DANIEL, &c.
vs
ALLISON.

and void under the act of 1820, (*Stat. Laws,* 1042) so far as they conflict with their claims.

The appellees entries are two of a block of entries, made in 1784, which rest upon, as a pivot or basis, a four thousand acre entry made on the Mississippi river, including the iron banks. The latter entry, as well as so many of those based upon it as are necessary to be recited, are as follows:

Entry of 4000 acres in the name of Montgomery and trustees.

*August* 2, 1784, *No.* 1.—John Montgomery, William Craughan, Mayo Carrington, and John Rogers, trustees for laying off a town on the Mississippi, enters four thousand acres of land on the Iron Banks, beginning at two large hickories at the head of a hollow on the bank, marked with three notches two ways, one as the bank runs down the river, and the other at right angles from it, and a sassafras and ash trees near to it, and at right angles from the said hickories, marked with three notches; thence from the said hickories so as to strike a creek emptying itself into the Mississippi above where the bluff or Iron Bank first comes close on the river, at the distance of 120 poles on a straight line above the mouth; thence down the several courses of the said creek and the Mississippi, so far as when reduced to a straight line, shall be 900 poles from the said hickories, then at right angles from the said distance and the said hickories for quantity.

Edward Douse's entry of 900 acres.

*August* 2, 1784.—Edward Douse, assignee, enters 900 acres of land, part of a military warrant, No. 1334, beginning at the south-west corner back from the river, of the town of Columbia, running with the town land upwards of 550 poles; thence out at right angles for quantity.

Cary Wyatt's entry of 900 acres.

*August* 2, 1784.—Cary Wyatt enters 1000 acres, No. 25, of a military warrant 120, beginning at Douse's lower back corner, of an entry of 900 acres, joining the town of Columbia, extending up the back line of the said entry to the corner thereof; thence at right angles for quantity.

Chas. Dabney's entry of 500 acres.

*August* 3, 1784—Charles Dabney enters 1000 acres, part of a military warrant, No. 28, beginning at the lower back corner of Cary Wyatt's entry, No. 25, of 1000

acres, running with said Wyatt's back line 500 poles; thence at right angles for quantity.

*August* 2, 1784.—John Williams enters 1000 acres of land on part of a military warrant, No. 155, beginning at the south east corner of the town line, running down the back line of the town until it joins Edward Douse, and off at right angles for quantity.

*August* 3, 1784.—Daniel Clark enters 900 acres, part of a military warrant, No. 278, beginning where John Gerault's 1000 acre entry corners with John Williams' entry of 1000, running with Williams' back line 500 poles; then at right angles out 288 poles; then at right angles and parallel with the first line 500 poles; thence to the beginning.

*August* 5, 1784.—William Clark enters 1000 acres, part of a military warrant, No. 2681, beginning at Daniel Clark's upper corner, joining Richard Taylor's entries, Nos. 110 and 208; Clark's entry is No. 55, running with Clark's line westwardly the whole length thereof; thence at right angles with Dabney's line of an entry, No. 87, and with Taylor's line of an entry, No. 208, so far as a line parallel with the first line will include the quantity.

*August* 6, 1784.—John Rogers enters 1000 acres, part of a military warrant, No. 141, beginning at William Clark's south corner, in Dabney's line of his entry, No. 87, and of Clark's entry, No. 210, running eastwardly with William Clark's line 500 poles; thence at right angles so that a line parallel with the first will include the quantity.

*August* 10; 1784.—John Allison enters 1200 acres, part of a military warrant, No. 122, beginning at the south-east corner of John Rogers' entry, No. 276, running with his back line westwardly, the whole length thereof; thence at right angles so far that a line parallel to the first shall include the quantity.

*August* 14, 1784, No. 622.—Willis Wilson enters 1000 acres of land, part of a military warrant, No. 2689, beginning at the south corner of John Allison's entry of 1000 acres, No. 382, running with said Allison's line 500 poles; thence off southwardly and at angles for quantity.

RAYS
*vs*
WOODS, AND
DANIEL, &c.
*vs*
ALLISON.

John Williams' entry of 1000 acres.

Daniel Clark's entry of 900 acres.

Wm. Clark's entry of 1000 acres.

John Rogers' entry of 1000 acres.

Appellee Allison's entry of 1200 acres.

Willis Wilson's entry of 1000 acres, under which appellee Woods claims.

The first of the two last entries is the one under which Allison claims, and the last the one under which the Woods' claim title.

The diagram facing this page will exhibit a connected view of the entries as the same have been surveyed and patented.

John Rogers' survey is made to occupy the space which William Clark's entry, which has since been withdrawn, was intended to embrace, as the plaintiffs below contend, and the space designated a "vacant space," is left for the ground which should have been occupied by John Rogers' entry, which J. Allison's entry calls to adjoin. The diagram to the east, laid down in squares, with lines running to the cardinal points, designate sections surveyed by Henderson, under the act of 1820, *Stat. Laws*, 1040, under which, and by virtue of patents issued for a part of the same, interfering with the plaintiffs, the defendants claim title. The parallelograms, represented with double lines and cross lines of the same, designates the ground which the defendants contend would be embraced by the entries of John Rogers, Allison and Wilson, if surveyed according to their entries.

The defendants also contend that the single line, from 5 to 4, represents the true position of the base line of the town tract according to the entry, and the single line, from 5 to 6, a line run at right angles to the same, which forms the northern boundary of the town tract, and of the block of entries based upon it.

We would premise that though the statute of 1820 declares *void* a patent founded upon an entry for military services, made prior to '92, so far as the same may be variant from the entry, it cannot be deemed to have been the intention of the Legislature to require *absolute certainty* in the identity between them; to require such certainty would be to require *perfection* in human agency and human instruments.

The inaccuracy of instruments, the variation of the needle, the decay and entire obliteration of locative objects by lapse of time, and the unevenness of the ground and other obstructions would render it practical-

Creek

2

5

B

I. Girault
1.000.

R. Taylor
1.000.

R. Franqois
1.000.

Columbus
4.000.

J. Williams
1.000.

D. Clarks
900.

J. Rogers
1.000.

D

North

E. Douse
900.

C. Wyatt
1.000.

E

C

C. Delaney
1.000.

Vacant
Space

4

3

2

1

J. Allison

W. Wilson
1.000.

A

4

1.200.

Rogers'
1.000.

9

10

11

12

Allison's
1.200.

14

13

Wilson's
1.000.

6

To face Page 220 Vol. 2.
Ben.Monroe's Reports.

Engraved by Doolittle & Munson
Cincinnati

ly impossible by human means, exerted with the best intentions, to produce *absolute certainty* in the correspondence between the entry and the survey in many cases. Reasonable certainty was all that was looked to or can be required. The object of the act was to restrict the military claimant to the land which was *intended* to be embraced by his entry, and to prevent him from running over the country under color of his entry, and procuring surveys to be made *palpably* variant from the same, on the better lands, to the injury of the right of the State to the same, as unappropriated land. That they did not intend to embarrass the military claimant, or subject his claim to a forfeiture for a slight apparent inaccuracy or departure from the entry, which no reasonable human means could certainly prevent, is manifested by the provision which they made in the same act, continued from session to session, for the survey of their entries and the consummation of their titles, and the provision which was made in the 17th section of the act of 1821, *Stat. Laws*, 1051, re-enacted by the 16th section of the act of 1825, *Stat. Laws*, 1057, prohibiting the Register in the first act, and the Receiver in the latter, from selling any *section* or portion of a section of land which may be included in any military entry or survey.

In view of the foregoing considerations, it may well be doubted, whether, if one of the locative objects has decayed, or is lost by time, so that it cannot be found by reasonable search and enquiry, the survey may not be made to conform to the other objects which are found, and are of unquestionable identity with the objects called for in the entry, without regard to the lost object.

We would further remark, that we cannot doubt that under the foregoing statutes the Receiver was guilty of a palpable violation of his duty, in permitting entries to be made under the State authorities so as to embrace any portion of a military *entry* or *survey*, if he was apprised of the same. But as entries have been made and patents have issued thereon, and as the act of 1820 declares absolutely *void*, the military patent, so far as a variance exists between it and the entry or location, without reference to the nature of the adversary claim, or

RAYS
*vs*
WOODS, AND
DANIEL, &c.
*vs*
ALLISON.

*absolute* certainty.

RAYS
*vs*
WOODS, AND
DANIEL, &c.
*vs*
ALLISON.

whether such claim existed at all or not; and as a plaintiff must recover upon the strength of his own title, and has no title if his patent be *void*, we cannot say that the irregularity of the defendant's title can help out the plaintiff's case.

As the Register has been required to issue no patent unless the survey correspond with the entry, when a patent has issued to *defeat a* plaintiff in ejectment relying thereon, it must appear *clearly, satisfactorily* and *conclusively,* to vary from the entry, and the extent and limit of such variance; and this devolves on the party impeaching the patent.

But the military entries have been surveyed mostly in the absence of their owners, by disinterested surveyors, chosen under State authority, and sent out with special instructions to make their surveys correspond with the entries, and the Register has been directed to issue no patent unless where such correspondence exists; and where a patent has issued under all these guards, bearing the great seal of the Commonwealth, it must be regarded as conferring *record evidence* of *title*, which will stand until its *variance* from the entry, as well as the *extent* and *limit* thereof shall be *clearly, satisfactorily* and *conclusively* shown; and the burthen of showing it lies upon the party impeaching the patent.

The denunciation of the statute is highly penal upon the military claimant, and to use the language of criminal jurisprudence, a *rational doubt* as to the variance should be tantamount to a finding in favor of the military patent.

With these preliminary remarks we will proceed to an examination of the cases before us.

The defendants rely upon two grounds to make out the variance.

Def'ts mode of surveying.

1st. That John Rogers' entry in the block lies on the south side of William Clark's entry, and should have been thus surveyed; and that Allison's and Wilson's, the claims under which the plaintiff's claim title, lie on the south of Rogers, and should have been surveyed accordingly, as exhibited in the parallelogram, designated with double lines, in which case they would not embrace any portion of the defendants claims—or that Rogers' should have been surveyed on the south of Clark's, and Allison's and Wilson's on the east of Rogers, in which case they would embrace only a small part of their claims.

2d. That if all those entries have been correctly surveyed in relation to each other, yet that the town entry of 4000 acres, which is the pivot or base of all the rest,

has been incorrectly surveyed in this—that the base line of 900 poles should have been run from 5 on the bluff or bank as the probable place where the hickories stood, to 4 on the river below, and that the survey should have been constructed on that base, by lines at right angles to the same, by which the block of entries constructed upon its back line would be thrown further to the south, and the greater portion of the land claimed by the defendants excluded; or that the hickories called for at the upper end of the base line, should be placed somewhere between the bluff at 5, and the corner on the creek at 2, in which case still a portion of the defendants claims would be excluded.

1st. All the entries exhibited were made about the same time and no doubt by the same hands—the superintendents, or some one or more of them that were entrusted to make locations for the benefit of the officers and soldiers of the Virginia State line. And it is apparent from an inspection of the calls of the several entries, that the locator who made them believed, and in making the locations acted upon the conviction that the Mississippi river ran from east to west, and by the call for east eastwardly he meant up the river, west or westwardly down the river, and south or southwardly out from the river.

Take Edward Douse's entry—it was evidently intended by its calls to lie on the *back line* of the town tract, which line is most appropriately designated by the line *out from* or *most remote* from the river, and not on the lower line of the town tract, which never could have been designated by the appellation of the *back line*, but rather of the *lower line*; yet it calls for beginning at the *south-west* corner of the town tract, which would be the corner at A, and not that at 4, under the supposition that *out* from the river was *south*, and *down* the river *west*. And under this supposition there is no confliction, but a perfect coincidence produced between the call for the *back line* and the *south*-west corner of the town tract.

John Williams' entry begins at the *south-east* corner of the town line, and runs *down* the *back line* of the town until it *joins Edward Douse*, and at right angles for quan-

tity. Upon the supposition that *out from* the river is *south*, and *up it* is *east*, the corner at B, in the plat, is appropriately described as the *south-east* corner of the town tract, and this call is perfectly consistent with the other calls of the entry, and the land intended to be appropriated embraced by the survey. But according to the true cardinal points, the corner at A would be the *south-east* corner, by assuming which as the corner intended, the entry could not run *down* upon the *back line* of the town tract, but would have to run *up*, in which case, instead of adjoining *Edward Douse's entry* it would be thrown upon it, and made to embrace the same land embraced by it.

So, on the same supposition, the call for *westwardly* from the beginning in Wm. Clark's entry, and the calls in Allison's entry for beginning at the *south-east* corner of Rogers' entry and running *westwardly*, and the calls in Wilson's entry for the *south* corner of Allison's entry, and running off *southwardly* at right angles with Allison's line for quantity, may all be reconciled with the other calls of the several entries, and entire harmony and consistency be produced.

Besides, it is proven in the cause that to an observer, standing on the bluff of the river at the Iron Banks, the river presents the appearance of running a westwardly course, owing to the large sheet of water that runs on the opposite side of Wolf Island.

To give, therefore, the proper construction to the entries, so as to make them embrace the land *intended* to be appropriated by the locator, which is the proper rule to adopt, we must keep in view the *mistake* which existed in his mind when the entries were made, and lay them down accordingly. Keeping in view this mistake and acting upon it, it is perfectly palpable that John Rogers' entry was intended to embrace the space on the connected plat, designated by the "vacant space," and that Allison's and Wilson's entries have been properly constructed upon it.

It calls for beginning at William Clark's *south* corner in *Dabney's line*, running *eastward with Clark's line;* thence at right angles so that a line parallel with the first

line, will include the quantity. Now upon the supposition that *out* from the river is *south*, though the corner of Clark's entry at C is not the *most* south corner, it is a *southwardly* corner, and upon the supposition that *up* the river is *eastwardly*, it is clear that the line from C to D was the line of Clark intended. The discrepancy in the call for *Dabney's line*, may be accounted for on the hypothesis that the locator acted upon the belief that the southern block of entries, constructed upon the town tract, would extend out far enough to push the east boundary of Dabney's entry beyond the corner of Clark at C, and which is readily corrected by the other calls of the entry. That the corner of Clark at E was not intended, nor the line from E to C, is evident, not only from the violence which would be done to the belief which we have shown was entertained by the locator, that the river ran from east to west, but also from the fact that such a construction would throw the entry, as to nearly one half of its quantity, upon the entry of Dabney, for which it calls, in violation of a well established rule, that when one entry calls for another, it should never be laid down so as to interfere with the one called for, as contrary to the obvious intention of the locator. Upon the whole, we are clearly of opinion that the first ground assumed by the defendants counsel is untenable.

2d. But we have had more difficulty with the second ground taken.

It is evident that the marked hickories, standing at the *head* of a *hollow*, on the *bank*, with a sassafras and ash marked as pointers, was to be the northern termination, and a point on the bank of the river below, at the distance of 900 poles from the hickories, was to be the southern termination of a base line, upon which a rectangular figure was to be constructed out from the river, so as to include the quantity called for. To find this base, the true position of *both* of *its ends* at the *date* of the *entry* must be ascertained. The hickories or other marked trees cannot be found, nor does any living witness know where they stood, nor does it appear that they were found by the surveyor who executed the survey, twenty years ago.

RAYS
vs
WOODS, AND
DANIEL, &c.
vs
ALLISON.

No *course* or *distance* is given from there to the point on the creek, 120 poles above the mouth, by which their true position may be ascertained. They are called for as standing on the *bank* at the *head* of a *hollow*—but whether the bluff or iron banks was meant, or a bank nearer the creek, which may appropriately have been called the bank, is not shown, and no description is given of the *hollow* nor of the *head* thereof, by which either can be distinguished from any other hollows or heads of hollows.

Taylor proves, that in going from the corner at 2 on the creek to 5 on the bluff, "in rising the hill there are two *small* hollows, about 65 or 70 poles from the corner on the creek, and from 25 to 35 poles from the point at 5;" he does not state where those hollows *head*, or what direction they run; they may, for ought that appears from his statement, head a considerable distance higher up the river, on the bluff, in which case, if one of them was the hollow intended, the whole block of entries would be thrown further to the north, and the plaintiffs entries, as well as patents, might embrace the land claimed by the defendants.

It is true that Ray, a defendant in one of the suits, testifies in the other, that there was a *head* of a hollow near the point at 5; but there are no distinguishing characteristics given to this hollow whereby it may be determined to be the hollow intended; and he does not show where the other hollow spoken of by Taylor heads. Besides, any little sink or cavity in the ground may be denominated a hollow, many of which, it must be presumed, may be found in the side of the bank above, answering the description called for just as well, no doubt, as the one described by Ray and Taylor, from any one of which, in proportion to its remoteness from the point at 5, will the block of entries be all thrown to the north, and the more so, as in proportion to the distance up the river, on the bank, the beginning of the base line is placed, will its southern termination be drawn up the river, by which it will be thrown more to the east than the termination of the present line, as the river bank bears to the east in running up from its present termination, as is apparent from the course called for in the original survey.

Again, the course of the bluff or bank, in its continuation up the river, from the point at 5, is not shown, and it may make a curve to the west, by which a right line from its bank at the head of some hollow, as significant as the one at 5, may be thrown but little out of the place or bearing of the base line, upon which the survey has been constructed.

Again, the witnesses state that at some places there is a continual abrasion of the banks of the river, and at others an extension of the same by alluvian, but they have not stated at what points the one or the other is taking place. If there has been an alluvian and extension of the bank at the lower termination of the base line, since the original survey was made, then would that end of the base, in the survey made under the order of court, be thrown to the west, in proportion to the increment or extension of the bank westwardly,- and the whole block of entries be thereby thrown proportionably to the south, and the departure from the original surveys, as exhibited, be produced in part or in whole.

Moreover, the inaccuracy and difference in the quality of surveying instruments, as well as in the skill of surveyors, in connection with the progressive variation of the needle, might produce a variance of several degrees in the courses of the lines of surveys, executed at as distant a day from each other, as even the original surveys and the re-surveys exhibited in the plat. And we should the rather indulge in the presumption in favor of the correctness of the former than the latter; and that the same have been executed according to the entries, when we take into consideration, that they were made by intelligent surveyors, sent out under the authority of the State, with special legislative instruction to make the surveys conform to the entries, uninfluenced by the proprietors, who in the most cases were absent; and as to the town tract, were accompanied by and acted under the instruction of disinterested superintendents, chosen and intrusted by the legislature for that purpose, some of whom were lawyers of known legal eminence and integrity, and who were upon the premises and had the benefit of an occular view of the situation of the ground, and of the objects

called for in the entry, and their relations to each other, so far as they were then in existence or could be found.

Upon the whole, we are satisfied that the variance or extent thereof has not been made out by the testimony, of that *clear*, *satisfactory* and *conclusive* character, which required the jury to find that the patents of either of the plaintiffs were void in part or whole. And we cannot, therefore, set aside their verdict upon the evidence, unless they have been misled by erroneous instructions of the Court, or the court has erred to the prejudice of the defendants, in withholding those that should have been given.

The first instruction asked by the defendants counsel, relates to the location of John Rogers' entry on the south of Clark's, and which was properly refused by the Court, for the reasons already given.

The second is erroneous and was properly refused, because it assumes the southern termination of the base line of the town tract to be at 4, and makes the finding of the jury turn exclusively on their believing that the hickories, called for in the entry, stood at 5, whereas the true position of the base line depends as much upon the true place of its southern termination as its northern.

The third instruction might have been properly refused upon the ground that there was no evidence tending to the conclusion that the hickories or *head* of any hollow stood twenty-five or thirty rods from the point at 5. But another instruction was· substituted in the place of this, upon its rejection, which we think more appropriately expresses the law upon the same point, in the following language: "that it is for them to find, from the evidence, where the hickories called for, as the beginning of the town tract stood, at the date of the entry; and if they should find where the hickories then stood, the base line of the town tract should be drawn from that point to a point on the river bank of the Mississippi below, at the distance of 900 poles, when reduced to a straight line, and the entry of the town tract, constructed on that base at right angles, and that the block of entries dependent thereon, should conform thereto; and if upon such base

there should be a variance between the entries under which the plaintiffs claim, and their patents, to the extent of such variance the patents are void."

From what has been said, it is apparent that this instruction, fairly interpreted, was substantially correct, and embraces the whole law of the cases in relation to the proper location of the base line and the construction of the block of entries upon it, and was predicated upon the proper facts, in substance, to be found by the jury.

But the Court stated to the jury, from the bench, upon submitting to them the instructions upon the law of the case, "that they ought to take into consideration the solicitude which Kentucky and Virginia both felt, to pay the officers and soldiers of the revolution; also that the entries were not made by the owners thereof, but by superintendents appointed for them, and that when the entries were made, it was a wilderness country inhabited by savages." And it is contended by the defendants counsel that this charge to the jury was improper and erroneous, and is sufficient ground of itself, for the reversal of the judgment. We think otherwise. It is customary in some of the States and in England, for the judges to charge the jury upon the facts of the case, as well as the law; and though that has not been the practice in this State, we are not prepared to admit that it would not be allowable here. Be this as it may, if the power should be exercised, and nothing was contained in the charge that was calculated to mislead the jury or to divert their attention from the issue or the facts to be found by them bearing on the issue, the verdict, for this cause, should not be set aside.

The matters submitted in charge in this case, taken in conjunction with the instructions that were given upon the law of the case, and the facts to be found by the jury, were not misleading. They were submitted as matters for their *consideration* and as worthy to be *weighed* by them, only in their examination of the facts which bear directly upon the issue, and which, according to the law as expounded to them *properly* by the Court, the case was made to turn, and not as matters that would authorize a

---

RAYS
*vs*
WOODS, AND
DANIEL, &c.
*vs*
ALLISON.

It is not error for Judges, in this State, to charge the jury upon the facts of a case as well as the law.

RAYS
vs
WOODS, AND
DANIEL, &c.
vs
ALLISON.

finding, independent of those facts or the law.   And thus understood, they cannot be deemed to have been misleading or erroneous, if even they were not proper.

The judgment is, therefore, affirmed with costs.

*Morehead & Reed* for appellants; *Owsley* and *Cates & Lindsey* for appellees.